**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| SANDY PAPALEO, ) | CASE NO.  1:10-cv-2146 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | **MEMORANDUM OPINION AND** |
| Defendant. ) | **ORDER** |

Plaintiff, Sandy Papaleo ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 ("the Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is REVERSED and this case is REMANDED for further proceedings consistent with this memorandum opinion and order.

## I. PROCEDURAL HISTORY

On January 24, 2006, Plaintiff filed an application for POD and DIB that alleged a disability onset date of October 3, 2004. (Tr. 14.) The application was denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 14.) On September 29, 2008, an ALJ held Plaintiff's hearing by video conference. (Tr. 14.) Plaintiff appeared at her hearing, was represented by an attorney, and testified. (Tr. 14.) A vocational expert ("VE") also appeared and testified. (Tr. 14.) On January 29, 2009, the ALJ found Plaintiff not disabled. (Tr. 21.) On July 27, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision. (Tr. 5.)

On September 23, 2010, Plaintiff timely filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) On February 19, 2011, Plaintiff filed her Brief on the Merits. (Doc. No. 11.) On April 20, 2011, the Commissioner filed his Brief on the Merits. (Doc. No. 16.) Plaintiff did not file a Reply Brief.

Plaintiff asserts three assignments of error: (1) the ALJ failed to give good reasons for according the opinion of Plaintiff's treating source, Dr. Faiman, less than controlling weight; (2) the ALJ's residual functional capacity ("RFC") determination is not supported by substantial evidence; and (3) the ALJ failed to consider whether Plaintiff was entitled to a closed period of disability even if Plaintiff was able (and willing) to work at the time of the hearing.[1]

---

[1] In a "closed period" case, the decision maker determines that a new applicant for disability benefits was disabled for a finite period of time that started and stopped prior to the date of her decision. *Shepherd v. Apfel*, 184 F.3d 1196, 1199 n.2 (10th Cir. 1999) (quoting *Pickett v. Bowen*, 833 F.2d 288, 289 n.1

2

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was 46 years old on the alleged disability onset date. (Tr. 20.) She has at least a high school education and is able to communicate in English. (Tr. 20.) She has past relevant work experience as a collector and an accounts receivable clerk for Marymount Hospital, Account Temps, Mount Sinai Hospital, and the Cleveland Clinic. (Tr. 20, 115.)

### B. Medical Evidence

On January 28, 2003, Plaintiff presented to Dr. Michael A. Harris, M.D., at the MetroHealth System Department of Physical Medicine and Rehabilitation upon referral from the Rehabilitation Services Commission for a disability determination examination. (Tr. 129.) Dr. Harris described Plaintiff's medical history as follows, which is based on reports from Plaintiff that Dr. Harris believed were reliable.

Plaintiff began suffering a ringing in her ear in March 2002 that developed into a "heaviness" that led to dizziness, hearing loss, and problems with her balance, memory, and speech. (Tr. 129.) An MRI of Plaintiff's brain revealed an "extensive abnormal signal involving the right mastoid air cells," which was suspected to be caused by serious otitis media[2] and possibly fluid. (Tr. 129.) A CAT scan was negative, however, and an ENG had non-specific findings. (Tr. 129.) Plaintiff had been seen at the Cleveland Clinic but discontinued her treatment there because she could no longer

---

(11th Cir. 1987)).

[2] Otitis media is "inflamation of the middle ear." Dorland's Illustrated Medical Dictionary, 1339 (30th ed. 2003).

afford it. (Tr. 129.)

After examining Plaintiff, Dr. Harris reported his impression of Plaintiff's condition as follows. Plaintiff had an "extensive abnormal signal involving the right mastoid air cells consistent with serious otitis media" that "results in significant functional limitations manifested by hearing loss, dysarthria,[3] and balance problems as well as speech issues." (Tr. 130.) Dr. Harris also noted that Plaintiff required a cane to walk. (Tr. 130.) Dr. Harris reported Plaintiff's functional limitations as follows. Plaintiff could stand with a cane for about 20 minutes and without a cane for 10 minutes. (Tr. 130.) She could lift between 5 and 10 pounds, but she could not carry anything because she required a cane to ambulate. (Tr. 130.) She could sit for one hour intervals for a maximum of 4 to 6 hours a day, although she needed to lie down throughout the day. (Tr. 130.) Plaintiff would not find gainful employment easily because of her problems with balance, memory, performing serial 7's, and hearing. (Tr. 130.)

On May 5, 2003, Plaintiff presented to Dr. Nimish J. Thakore at the MetroHealth System Neurology Department. (Tr. 123-25.) Plaintiff had complained of right-side weakness in the past, but now complained of left-side weakness as well. (Tr. 123.) Plaintiff also complained of widespread pain. (Tr. 123.) Upon physical examination, Dr. Thakore reported that Plaintiff walked with a cane in her right hand, had a right foot drop, and had a stiff left leg. (Tr. 124.) Upon neurological examination, Dr. Thakore reported that Plaintiff had a "peculiar spastic-type dysarthria," reduced hearing in her

---

[3] Dysarthria is "a speech disorder consisting of imperfect articulation due to loss of muscular control after damage to the central or peripheral nervous system." Dorland's Illustrated Medical Dictionary, *supra* note 2, at 572.

4

right ear, giveaway weakness in her right arm and right leg, and intermittent tremors. (Tr. 124.) Dr. Thakore concluded, however, that Plaintiff had variable symptoms and examination results with no objective signs. (Tr. 125.) Dr. Thakore suspected that Plaintiff had a psychogenic disorder, although he indicated that he could not offer a definite neurological diagnosis. (Tr. 125.)

On May 22, 2003, Plaintiff underwent an MRI of her brain. (Tr. 122.) On June 9, 2003, Plaintiff presented to Dr. Thakore for a follow up on the MRI. (Tr. 121.) Dr. Thankore indicated that the MRI was "normal." (Tr. 121.) Dr. Thakore reported that his examination of Plaintiff revealed no definite objective abnormalities, and that he again could not offer a neurological diagnosis to explain Plaintiff's waxing and waning, complex symptomology. (Tr. 121.)

On March 4, 2004, Plaintiff presented to Dr. Neil Cherian, M.D., for an otoneurology re-evaluation. (Tr. 201.) Dr. Cherian indicated that Plaintiff reported the following. Plaintiff had numbness and tingling in her hands and feet; felt tired often; sometimes lost her ability to grip with her hands; sometimes became too hot and, therefore, could not function; sometimes suffered "garbled" speech; had poor memory; and sometimes lost her ability to reason. (Tr. 201.) Plaintiff's right eye sometimes "locked" such that it stared straight while she could still move her left eye, and when this happened the right side of her face would droop. (Tr. 201.) Plaintiff's issues at work, however, were improving. (Tr. 202.)

Dr. Cherian reported that Plaintiff presented a "[c]omplex case dominated by personality issues and a possible factitious disorder." (Tr. 202.) Dr. Cherian could not determine whether Plaintiff's symptomatology represented "true conversion" or was

5

more of a malingering pattern, and whether it was based on a remote brain injury.  (Tr. 202.)  Dr. Cherian strongly believed that Plaintiff needed psychiatric evaluation and management.  (Tr. 202.)

On April 19, 2004, Plaintiff presented to Dr. Matthew R. Faiman, M.D., at the Cleveland Clinic.  (Tr. 100, 188.)  Dr. Faiman reported that Plaintiff had mild encephalopathy[4] status post right otitis that developed persistent migratory numbness, tingling, dizziness, and a "probable" conversion disorder.  (Tr. 188.)  Dr. Faiman noted that he would "arrange FMLA for intermittent leave for [Plaintiff] and have her see psych here."  (Tr. 188.)

On November 23, 2004, Dr. Faiman reported that Plaintiff had been on short-term disability since October 2004.  (Tr. 173.)  Dr. Faiman further indicated that Plaintiff reported she was less shaky and able to "sense things" on her right side; scrub her floors at home; and had no "seudo-seizure activity."  (Tr. 173.)  On December 27, 2004, Dr. Faiman reported that Plaintiff could begin a gradual return to work, starting with 6 hours per day for the first 2 weeks and then resume work without restrictions.  (Tr.169.)  Per Dr. Faiman's notes on January 12, 2005, and Plaintiff's testimony at her hearing, however, it appears that Plaintiff's employer refused to allow Plaintiff to return to work and continued Plaintiff on short-term disability.  (Tr. 163, 415.)

On April 1, 2005, Dr. Faiman reported that although Plaintiff was diagnosed with a conversion disorder and an unspecified encephalopathy, Plaintiff's symptoms and affect were stable.  (Tr. 161.)  Dr. Faiman noted that Plaintiff was off all medications;

---

[4] Encephalopathy is "any degenerative disease of the brain."  Dorland's Illustrated Medical Dictionary, *supra* note 2, at 610.

that Plaintiff's mood was stable even though she never filled her prescription for Zoloft; that Plaintiff's speech was stable; and that recently there had been no significant exacerbation of her condition.  (Tr. 160.)  Although Plaintiff desired to return to work, Dr. Faiman was still concerned that the daily stress from a return to work might exacerbate Plaintiff's symptoms.  (Tr. 161.)  After consulting with "Dr. Stenroos,"[5] Dr. Faiman concluded that there was a high risk that a return to the workforce would cause Plaintiff to relapse.  (Tr. 161.)

On June 6, 2005, Dr. Faiman reported that Plaintiff was on disability because of her conversion disorder; that Plaintiff was "overall doing ok"; and that, although Plaintiff's speech was fine the day before, Plaintiff was presently "more dysarthric."  (Tr. 157.)  Dr. Faiman opined that Plaintiff's conversion disorder was unchanged, and that Plaintiff was not ready for employment.  (Tr. 158.)

On October 26, 2005, Dr. Faiman reported that, if Plaintiff underwent intense therapy and improved her condition over the following 3 to 6 months, he could envision Plaintiff engaging in some type of employment even though there was a high risk that Plaintiff's condition could relapse.  (Tr. 152.)  Dr. Faiman indicated that he would confer with Dr. Stenroos and develop a treatment plan for Plaintiff for the next 6 to 12 months.  (Tr. 152-53.)

On January 17 and April 19, 2006, Dr. Faiman reported that Plaintiff had been

---

[5] Ms. Karen M. Janesz, a vocational rehabilitation counselor at the Cleveland Clinic, reported that Dr. Stenroos was a psychologist at the Cleveland Clinic who had examined and treated Plaintiff for her "brain infection" from June 2004 to September 2007.  (Tr. 133.)  The record does not appear to contain any reports or opinions from Dr. Stenroos.

7

much less stressed, that Plaintiff's anxiety and energy were "better," and that Plaintiff was "emotionally better," although Plaintiff still suffered mild dysarthiria. (Tr. 146, 148.) Nevertheless, on April 19, 2006, Dr. Faiman reported that he suggested that Plaintiff consider Social Security Disability. (Tr. 147.)

On April 24, 2006, Plaintiff underwent an Adult Clinical Interview with psychologist Dr. Richard N. Davis. (Tr. 243-51.) Dr. Davis noted that Plaintiff had "a severe speech deficit as a result of a brain infection" and scored within the lower end of the Low Average range of intellectual functioning. (Tr. 248.) Dr. Davis indicated that Plaintiff reported sleeping fitfully and being able to cook, wash dishes, do laundry, clean her home, bathe, dress herself, watch television, go for walks, weed around her apartment, and go grocery shopping, although she has to rest intermittently. (Tr. 247.) Dr. Davis noted in summary, however, that Plaintiff reported her activities of daily living were restricted because she had limited energy. (Tr. 248.) Dr. Davis further reported that Plaintiff had no difficulty sitting, standing, or moving about in his presence; had no difficulty hearing; and could be understood despite her speech impairment once one became accustomed to her manner of speaking. (Tr. 249.) Dr. Davis concluded that Plaintiff suffered a "cognitive disorder" and presented "with only minor limitations in her abilities to think logically [and] use common sense and judgment." (Tr. 249.) Dr. Davis assigned Plaintiff with a Global Assessment of Functioning ("GAF") score of 60[6] that he

---

[6] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A person who scores in this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

8

indicated suggested only moderate symptoms. (Tr. 249.)

On May 6, 2006, consultant David Dietz examined Plaintiff and authored a Psychiatric Review Technique form.[7] (Tr. 152-64.) Mr. Dietz assessed Plaintiff under Listing 12.02 from 20 C.F.R. Part 404, Subpart P, Appendix 1 and determined that Plaintiff was mildly limited in her abilities to perform activities of daily living and maintain concentration, persistence, or pace; was not limited in her ability to maintain social functioning; and had no episodes of decompensation. (Tr. 262.)

On August 18, 2006, Plaintiff presented to the Lakewood Hospital emergency room because she was "not able to talk" and had slurred speech. (Tr. 270.) A neurological examination, an MRI, and an EEG, however, were "negative." (Tr. 270.) Plaintiff was diagnosed with transient cerebral ischemia,[8] convulsions, alcohol abuse, aphasia, hearing loss, hypertension, and cardiac dysrhythmia; but Plaintiff was discharged in stable condition. (Tr. 270.)

On September 15, 2006, Dr. Faiman indicated that he would keep Plaintiff "off work" and "will need to push for SS disability sooner as $$ an issue." (Tr. 350.)

On October 9, 2006, Dr. Faiman reported that Plaintiff had no changes in her condition. (Tr. 354.) Although Plaintiff's symptoms waxed and waned, Dr. Faiman submitted Plaintiff's Social Security paperwork, and believed that any job would be a stressor and that any stressor could exacerbate Plaintiff's condition. (Tr. 354.) Dr.

---

[7] The record does not indicate Mr. Dietz's credentials.

[8] A transient ischemic attack is "a brief attack (from a few minutes to an hour) of cerebral dysfunction of vascular origin, with no persistent neurological deficit." Dorland's Illustrated Medical Dictionary, *supra* note 2, at 178.

Faiman explained that "[i]t is too unpredictable [to] know what might happen to her [symptoms] with mild or moderate or any stress from employment at this time." (Tr. 354.)

On October 20, 2006, Dr. Faiman authored a medical source statement of Plaintiff's physical capabilities as follows. (Tr. 360-61.) Plaintiff could lift and carry only "very little" weight. (Tr. 360.) She could stand for only half an hour total and for half an hour without interruption. (Tr. 360.) She could sit for only 1 hour total and for half an hour without interruption. (Tr. 360.) She could rarely or never climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push, pull, and perform fine and gross manipulation. (Tr. 361.) She was restricted from working in environments with heights, moving machinery, temperature extremes, chemicals, dust, noise, and fumes. (Tr. 361.) However, she did not require a sit/stand option, and she suffered only mild pain. (Tr. 361.) Dr. Faiman concluded that he believed Plaintiff was not capable of employment at that time. (Tr. 361.)

On December 8, 2006, Dr. Faiman reported his findings upon evaluation of Plaintiff as follows. (Tr. 349-51.) Plaintiff had no joint pain or swelling, back pain, or muscle pain. (Tr. 350.) Plaintiff appeared alert, cooperative, and in no acute distress. (Tr. 350.) Plaintiff's gait was normal and intact. (Tr. 350.) Plaintiff's dysarthria was "stable," her affect was "appropriate," her speech was "normal," and her thought processes and thought content were "normal." (Tr. 350.) Plaintiff's encephalopathy was "stable" as well, but Dr. Faiman's plan was to keep Plaintiff off work. (Tr. 350.) Dr. Faiman indicated in conclusion that either he or Plaintiff "will need to push for SS disability sooner as $$ an issue." (Tr. 350.)

10

On March 9, 2007, Dr. Faiman reported that Plaintiff's dysarthria was "better" although Plaintiff was still "having episodes"; that Plaintiff chose to stop taking her medication; that Plaintiff could now sit for 2 to 3 hours; and that Plaintiff was "still going to volleyball."  (Tr. 366.)  Dr. Faiman indicated that he would "adjust" Plaintiff's paperwork for Social Security if and when the Social Security Administration sent the paperwork to him, but that he still felt that Plaintiff was not ready to work "as the stressors of day to day would exacerbate her tenuous symptoms."  (Tr. 367.)

On May 30, 2007, Dr. Faiman reported that Plaintiff was "at her best" and was "very positive"; however, Dr. Faiman noted that, "placed in any stress of employment, I am not certain what this might do to her symptoms."  (Tr. 364.)  Dr. Faiman indicated that he would speak with Dr. Stenroos.  (Tr. 364.)

On May 5, 2008, Plaintiff presented to Ms. Karen M. Janesz, a vocational rehabilitation counselor at the Cleveland Clinic, for a vocational rehabilitation consultation upon referral from the Cleveland Clinic Long Term Disability Committee.  (Tr. 133-34.)  Ms. Janesz reported that Plaintiff had not been under a doctor's care "for some time."  (Tr. 134.)  Ms. Janesz further reported that, "[g]iven [Plaintiff's] derogatory remarks regarding the Cleveland Clinic and uncertainty of mental stability, [Plaintiff] would have difficulty representing the hospital in a customer service position."  (Tr. 134.)  Ms. Janesz concluded that, "[s]ince [Plaintiff] enjoys gardening and does not report physical limitations, she might do well in a job working with plants."  (Tr. 134.)

On June 26, 2008, Plaintiff underwent a neuropsychological evaluation by Dr. Robyn M. Busch, Ph.D.  (Tr. 374-76.)  Dr. Busch indicate that Plaintiff reported she stopped working in October 2004; that her symptoms improved in April 2007 when she

11

began drinking wheatgrass juice; that her symptoms were now resolved; and that she desired to return to work. (Tr. 374.) Dr. Busch was under the impression that Plaintiff's "level of ability has likely been in the average range." (Tr. 376.) Upon testing, Dr. Busch found that Plaintiff had difficulty with word-retrieval, and that Plaintiff demonstrated "borderline to extremely low" performance on testing of spatial orientation, complex visuoperception/construction, fine motor speed, and manual dexterity. (Tr. 376.) Dr. Busch found that Plaintiff's adequately performed all remaining cognitive tests, including memory tasks. (Tr. 376.)

### C. Hearing Testimony

#### 1. Plaintiff's Testimony

Plaintiff testified at her hearing as follows. Plaintiff wanted to return to work. (Tr. 423.) She had not seen a mental health professional for over a year. (Tr. 416.) At the time she stopped working, she had been experiencing hearing loss and speech problems, and she had trouble balancing. (Tr. 413.) In early 2005, she had attempted to return to work but her employer would not allow her to return; rather, her employer placed her on short-term and then long-term disability. (Tr. 414-15.)

Plaintiff used to experience "episodes" approximately every three days, but at the time of the hearing she had not had an "episode" in a couple of months (although her speech remained slightly slurred). (Tr. 415.) When she had been experiencing severe symptoms, she was forced to lie down every 10 minutes. (Tr. 422.) At the time of her hearing, however, Plaintiff could walk 3 and one half to 4 miles; stand 45 minutes at a time; sit for "hours"; and lift 20 pounds. (Tr. 416-17.) She essentially had no problems

12

performing activities of daily living.  (Tr. 418-23.)

### 2. The VE's Testimony

The ALJ posed the following hypothetical to the VE:

[C]onsider an individual such as [sic] the claimant's education, and work experience, who can lift 20 pounds occasionally and 10 pounds frequently. Stand and/or walk six hours during an eight hour work day, and sit six hours during an eight hour work day, and such an individual is limited to unskilled work.

(Tr. 425.)  The VE testified that such a person could not perform Plaintiff's past relevant work because Plaintiff's past relevant work was skilled work.  (*See* Tr. 425.)  The VE testified that such a person could, however, perform other work as a sales attendant (for which there were 157,920 jobs in Ohio), cafeteria attendant (for which there were 12,340 jobs in Ohio), and folding machine operator (for which there were 8,920 jobs in Ohio).  (Tr. 425.)

The ALJ then asked whether such an individual who was also limited to one- or two-step tasks could perform such work.  (Tr. 425.)  The VE testified that such a person could still perform the folding machine operator job.  (Tr. 426.)  The VE further testified that such a person could perform other work as a small products assembler (for which there were 29,440 jobs in Ohio), and laundry bagger (for which there were 8,920 jobs in Ohio).  (Tr. 426.)

Plaintiff's attorney asked the VE whether the foregoing hypothetical person could perform any of the proffered jobs if she were restricted to occasional superficial interaction with the public, co-workers, and supervisors; could not perform duties that required fine motor speed or manual dexterity; and had to avoid heights, moving machinery, and other dangers.  (Tr. 426.)  The VE testified that such a person would not

13

be able to perform any of the proffered jobs specifically because the jobs require frequent use of hands. (*See* Tr. 426-27.)

The VE testified that his testimony was based in part on data from the United States Bureau of Labor Statistics (Tr. 424) and was consistent with the Dictionary of Occupational Titles (Tr. 426).

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905

14

F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since October 3, 2004, the alleged onset date.

3. The claimant has the following severe impairments: history of encephalitis, transient cerebral ischemia and a conversion disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform unskilled light work.

6. The claimant is unable to perform any past relevant work.

. . . . .

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 3, 2004 through the date of this decision.

(Tr. 16-21.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

16

(6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.     The ALJ's Assessment of Plaintiff's Treating Source

Plaintiff argues that the ALJ erred because she failed to give good reasons for according the opinion of Plaintiff's treating source, Dr. Faiman, less than controlling weight. For the following reasons, the Court agrees.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted). If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, including: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) the specialization of the treating source. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007) (citing *Wilson*, 378 F.3d at 544 and 20 C.F.R. § 404.1527(d)(2)). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific

17

to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (1996)).

It is not disputed that Dr. Faiman is a treating source.  The ALJ gave Dr. Faiman's opinion less than controlling weight because she believed that Dr. Faiman favored Plaintiff and gave a subjective, favorable evaluation of Plaintiff so that Plaintiff could obtain benefits from the Social Security Administration.  The ALJ explained her suspicions as follows:

> The claimant's medical records show that the majority of her treatment has been at the Cleveland Clinic, the emergency room in which the claimant was employed previously.  Interestingly, when the claimant went to a different hospital in August of 2006 and was examined by a consultant, Dr. James Crandell, he indicated that the claimant was "mainly interested" in disability benefits.  Thus, there is some evidence of a possible conflict on [sic] interest with regard to her treatment providers and the fact that she used to work with them.
>
> . . . . .
>
> Dr. Faiman's opinion is not accorded particular weight in the decision, as he was a doctor at the emergency room in which the claimant worked, thus there could be a conflict of interest.  Further evidence of conflict of interest includes a statement by Dr. Faiman in October of 2006 stating "will need to push for [Social Security] disability sooner as [money is] an issue."  Also, Dr. Faiman stated in March of 2007, after the claimant had initially been denied disability, that he would "adjust [the] paperwork for Social Security."

(Tr. 19.)

Treating physicians can sometimes be biased in favor of their patients.  *Micus v. Bowen*, 979 F.2d 602, 607 (7th Cir. 1992) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").  But the fact that Dr. Faiman and Plaintiff both worked for the Cleveland

18

Clinic, alone, is simply not a sufficient basis to conclude that Dr. Faiman's opinion was biased and unreliable, and the ALJ's "further evidence" of possible bias does not support the conclusion that there was bias.  Cf. *Tokarz v. Sec'y of Health & Human Servs.*, 881 F.2d 1077 (Table), 1989 WL 90766, at *2 (E.D. Mich. Aug. 11, 1989) (finding that the ALJ appropriately declined to defer to a treating physician's opinion when the opinion was inconsistent and conclusory, and the physician appeared willing to modify his reports to establish appellant's disability).  There is no basis in the record to conclude that Plaintiff and Dr. Faiman worked together, as Plaintiff was involved in collections and there is no indication that she worked in the emergency room wherein the ALJ concludes Dr. Faiman worked.  There is also no basis in the record to conclude that Plaintiff and Dr. Faiman had a particularly friendly relationship with one another other.  Indeed, the evidence shows that Plaintiff was very unhappy with the Cleveland Clinic.  Moreover, the ALJ's observation that Dr. Faiman intended to "adjust" Plaintiff's Social Security paperwork is taken out of context; Dr. Faiman intended to adjust Plaintiff's paperwork to indicate that Plaintiff's symptoms had improved, which militates against the notion that Dr. Faiman intended to fabricate limitations that were more severe than what Plaintiff objectively suffered.

The Commissioner contends that the ALJ properly rejected Dr. Faiman's opinion because Dr. Faiman's opinion is not supported by substantial evidence; but the ALJ did not state this as one of her reasons for rejecting Dr. Faiman's opinion, and the ALJ did not otherwise address their supportability or consistency of Dr. Faiman's opinion.  In failing to provide adequate good reasons for giving Dr. Faiman's opinion less than controlling weight when it supported a more restrictive RFC than the ALJ determined,

19

the ALJ failed to abide by an important procedural safeguard intended to protect claimants.  See *Wilson*, 378 F.3d at 544-45.  Remand is necessary so that the ALJ may appropriately and adequately assess Dr. Faiman's opinion.

Dr. Faiman's opinion bears directly on Plaintiff's RFC and whether it is supported by substantial evidence, and whether Plaintiff is entitled to a closed period of disability.  Therefore, the Court is unable to fully address these issues at this time.  Upon remand and after the ALJ re-assesses the credibility of Dr. Faiman's opinion, the ALJ should clearly explain the basis of her RFC determination and consider whether Plaintiff is entitled to a closed period of disability.

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and this case is REMANDED for further proceedings consistent with this memorandum opinion and order.

**IT IS SO ORDERED**.

                                         s/ *Nancy A. Vecchiarelli*
                                         U.S. Magistrate Judge

Date: September 30, 2011